*********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were properly before the Industrial Commission, the Industrial Commission has jurisdiction of the parties and of the subject matter, and the parties *Page 2 
are subject to and are bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. The date of the alleged injury by occupational disease is April 30, 2002.
4. Liberty Mutual Insurance Company is the carrier on the risk.
5. Plaintiff's wages were sufficient to generate the maximum weekly compensation rate for 2002 of $654.00 per week.
6. At hearing the parties stipulated to the following:
 a. Stipulated 1: Pre-Trial Agreement
 b. Stipulated 2: Industrial Commission Forms
 c. Medical Records
 d. Medical Bills
 e. Material Safety Data Sheets
 f. Stipulated 3: Plaintiff's Discovery Responses
 g. Defendants' Exhibit 1: Application for hourly employment
 h. Defendants' Exhibit 2: Chemical Exposure Air Sampling
 i. Defendants' Exhibit 4: Chemical Exposure Air Sampling
 j. Defendants' Exhibit 8: Picture Stage 1 Tire Builder
 k. Defendants' Exhibit 9: Picture Machine Checker
 l. Defendants' Exhibit 10: Picture Machine Checker
 m. Defendants' Exhibit 11: Picture Tire Builder
 n. Defendants' Exhibit 12: Picture Code Changer *Page 3 
 *********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, born on November 7, 1961, was 43 years old as of the date of the hearing before the Deputy Commissioner.
2. When plaintiff was younger, he worked on two different farms that had crops of soybeans, corn and tobacco. He did this twice a week and for two summers while he was in high school. He mainly worked in the tobacco fields and actually handled the tobacco sometimes.
3. Plaintiff's employment history includes work for Horton Sign Company where he made signs out of Plexiglas, which required heating Plexiglas in order to shape it into the shape the customer wanted. Plaintiff also worked for Burney Construction where he participated in welding and transporting materials in vehicles. Plaintiff received his welding experience during high school and he stated on his application to defendant-employer that he had been welding for five years, including his time in high school and his time working construction. Plaintiff also operated a tractor during daylight hours to transport materials for both his construction and his farming jobs. Plaintiff worked for a landscaping company where he drove a truck to transport equipment from site to site, and if someone was sick, he did some seeding. Plaintiff worked eight-hour days for the landscaping company. Five to six of those hours would be outside in the daylight.
4. Plaintiff hunts deer and squirrels. He hunts deer from October through January once or twice a week. When he goes deer hunting, he is outside before the sun rises and stays outside hunting for a couple of hours after the sun comes up. Plaintiff stated that ten years ago *Page 4 
he used to run dogs to hunt deer, which could be done all day. Plaintiff also works outside in his yard. Plaintiff also had a horse for about two years which he would occasionally ride outside on Sunday afternoons. Plaintiff also admits to having been sunburned in his lifetime.
5. Plaintiff was hired by defendant-employer on August 22, 1983 and worked as a tire builder for several years until he switched positions and became a machine checker.
6. On or about April 30, 2002, plaintiff was diagnosed with basal cell carcinoma, which is a form of epitheliomatous cancer.
7. Plaintiff alleges that, as a result of his employment with defendant-employer, he was exposed on a daily basis to aromatic oil containing paraffin extract, which resulted in the development of an occupational disease, epitheliomatous cancer, listed under N.C. Gen. Stat. § 97-53(14). Specifically, plaintiff alleges that his basal cell carcinoma was a result of being exposed to various chemicals in his workplace.
8. Material Safety Data Sheets (hereinafter referred to as "MSD sheets") for chemical compounds that were in plaintiff's work area were introduced into evidence at the hearing before the Deputy Commissioner. The MSD sheets were provided to defendant-employer by the producer of the respective compounds. According to these MSD sheets, Vulkanox 4020 Liquid, Westvaco X-47552 and Vulkacit are not listed by NTP (National Toxicology Program), IARC (International Agency for Research on Cancer) or regulated as a carcinogen by OSHA (Occupational Safety and Health Administration); Flexon 641 (also called sardine oil) does not require a cancer hazard warning and has been judged to be neither a corrosive nor an irritant under the OSHA Hazard Communication Standard criteria; Citgo Quenching Oil 22 has been determined not to present a physical or a health hazard as defined by the OSHA Hazard Communication Standard; and Tolu-Sol (also called kanjine) was determined *Page 5 
to be slightly irritating to the skin and prolonged or repeated contact with the liquid can result in defatting and drying of the skin which may result in skin irritation and dermatitis. Urbonine/ Sundex has an MSD sheet warning the product may cause skin cancer with prolonged and repeated contact due to the fact that the compound contains paraffinic distillate solvent extract. Plaintiff was not exposed to Urbonine/Sundex in a pure form but rather it is an ingredient in the rubber itself.
9. Plaintiff worked in the Stage 1 tire building area from August 22, 1983 until November 8, 2000. During his time building tires, plaintiff testified he built tires in a similar fashion as all of the other tire builders, however, plaintiff stated in his testimony that every tire builder had their own technique.
10. Plaintiff is currently classified as an R-1 tire machine checker at defendant-employer's Fayetteville plant. As a machine checker and/or code changer, his responsibilities are to maintain the machines and/or change the specifications on the machine to run a different type of tire and to assure the machine is working properly. As part of this job, plaintiff typically builds some tires each day.
11. Previously, as a tire builder, plaintiff came in contact with green rubber in making a green tire. When errors occurred in building a tire, he would use a releasing agent called kanjine (Tolu-Sol) on the part that was produced improperly. Plaintiff claimed that in releasing the rubber, he sometimes got kanjine on his hands. There were days when the use of kanjine was not required. On others, it might be used two to three times. Kanjine evaporates from the skin within seconds.
12. The primary time that one uses kanjine is to repair a defective tire carcass that needs to be removed from the other components of a tire. The method tire builders use to *Page 6 
remove the part is to get a hook and use it to pull the part off while the kanjine is being used to release it. Usually, the carcass can be removed by using the hook and kanjine without difficulty. Plaintiff used this method and when he did so, no kanjine normally came in contact with his hands. Plaintiff did not want to get kanjine on his hands and he tried to avoid doing such.
13. Another chemical compound that plaintiff testified that his hands came in contact with while at work was sardine oil (also called Flexon 641). This was used to keep the blade on a knife lubricated for use in cutting rubber components. Sardine oil was removed from the tire room because it could cause tire components to fail to adhere to each other, but some employees still used it.
14. Other than the kanjine and sardine oil, the only other claimed contact plaintiff has in the tire room was in handling the rubber itself and occasionally, minimal amounts of hydraulic fluid. To the extent that it is avoidable, plaintiff does not touch hydraulic fluid when it is leaked on the floor and if he does, he wipes it off. This is important because to handle the green tire components with hydraulic fluid on his hands will contaminate those components. If contaminated, the rubber will not adhere properly and then it becomes a hazard for the traveling public to use that tire.
15. No rubber components are ever heated in the part of the facility where plaintiff works. The room is de-humidified and air-conditioned. There are no open containers of any chemical compounds in the area where plaintiff works and no chemical compounds are mixed in the area where plaintiff works.
16. By the time any rubber compound enters plaintiff's work area it is a solid slab of rubber. If plaintiff or his co-workers see rubber come in that has a milky-looking film on it, they immediately contact management and have it tested and analyzed and they do not handle it. *Page 7 
17. Ms. Deborah Johnson is employed by defendant-employer as a human resources specialist and workers' compensation administrator. She was employed in that position in October 2003. Prior to that, from 2001 to 2003 she was a safety coordinator for defendant-employer's plants. Before 2002, Ms. Johnson's job was to assist the safety manager and work in different areas such as reviewing OSHA standards, reviewing MSD sheets, approving requisitions and more or less dealing with safety issues. From 1999 to 2001, she was the actual safety manager for defendant-employer's plants. From 1994 through 1999 she was an industrial hygiene technician for defendant-employer and from 1995 to 1999 she traveled for defendant-employer to five different plants doing industrial hygiene testing. The only skin related complaints about which she is aware relate to a few instances of rubber rash, but these employees were moved to a different area and the problem dissipated.
18. Defendant-employer does sample testing for exposure to chemical compounds by their employees. When measuring the amount of a particular compound in the air, defendant-employer follows National Institute of Occupational Safety and Health (NIOSH) guidelines. These guidelines are also approved by OSHA. This testing is done all over the plant, including the room where plaintiff worked as an R-1 tire changer and currently works as a machine checker. Most are personal samples taken while an employee is doing his regular duties in a department. None of the sampling exposure tests performed show any exposure above 25% of OSHA's permissible exposure limit (hereinafter referred to as "PEL"). Further, based on all of the testing conducted by Ms. Johnson, she testified that she has never seen a sample which reflected that someone was exposed above the OSHA PEL standard.
19. Also testifying at the hearing was Mr. Stanford Locklear. Mr. Locklear is employed by defendant-employer at the same plant that plaintiff is employed. For the first 17 *Page 8 
years of his employment, Mr. Locklear worked as a compound or rubber chemist in the mixing area where he wrote the formulas for the rubber. For the next four years of his employment with defendant-employer he was in total quality control and since 1996 he has been back in the mixing area as a technical team leader. Mr. Locklear testified that there is nothing in a tire room that causes your eyes to sting or your nose to burn or your throat to constrict and he has never heard of anyone other than plaintiff complain about the tire room.
20. Mr. Walter Hill has worked for defendant-employer since 1974. His jobs with defendant-employer have included R-1 tire builder, second stage builder, machine checker and shift coordinator. Since 2001, he has been employed as a manufacturing team leader. Mr. Hill built tires for approximately seven years and testified that he never got any residue on his hands nor did his hands ever get dirty. Mr. Hill has never seen kanjine sprayed out onto the body of an employee in association with the work of an R-1 tire builder or a code checker.
21. Dr. Erik Kenyon, a Doctor of Osteopathy who is board certified in eye, nose, and throat and facial plastics, first saw plaintiff on January 26, 2000, at which time he had no skin lesions. It was not until the December 31, 2001, office visit, that Dr. Kenyon noted skin lesions, which were areas of the skin that were scaly or raised, ulcerated, and which could be a pre-cancer or cancer. The most significant lesion was on the left portion of his neck, which was treated with Efudex, a type of chemotherapy for the skin.
22. On January 4, 2002, Dr. Kenyon excised one of the lesions on plaintiff's left posterior neck. On January 23, 2002, plaintiff had a wider excision of the area. Thereafter, on February 5, 2002, plaintiff had a third excision of the same area. *Page 9 
23. A pathology report identified the removed lesion as a basal cell carcinoma. The pathology report specifically stated that the excised tissue was sun-damaged skin with basal cell carcinoma invading the superficial and mid-dermis.
24. At the June 26, 2002, office visit, plaintiff presented with a lot of scaling areas on the skin around his face, neck and hands, which were treated with Efudex. At the September 9, 2002, office visit plaintiff presented with actinic keratosis on his right neck and a possible squamous cell carcinoma on the left wrist which was again treated with Efudex. Actinic keratosis is a pre-cancerous change that occurs in the skin from sun exposure or exposure to any irritant to the skin.
25. At the October 8, 2002, office visit, plaintiff presented with extreme redness around his face from using the Efudex. On December 18, 2002, plaintiff presented with new lesions on his neck and hand. On March 17, 2003, plaintiff presented with a number of pre-cancerous lesions which appeared on his face, neck and hands, which were treated with Efudex.
26. On April 28, 2003, plaintiff returned to Dr. Kenyon and the pre-cancerous areas had resolved with the Efudex. On July 28, 2003, plaintiff presented with more skin lesions on his right wrist and left nose which were treated with Efudex. On October 29, 2003, plaintiff returned to Dr. Kenyon with new lesions on his hands. Dr. Kenyon referred plaintiff to Dr. Donahue for evaluation of his hands. On the November 10, 2004 visit plaintiff presented with a basal cell carcinoma on his right lower eyelid and the left side of his neck, which were excised on December 3, 2004. The pathology report confirmed that the right lower eyelid was a basal cell carcinoma with some focal carcinoma remaining at one of the margins.
27. On the January 17, 2005, medical visit Dr. Kenyon noted that there was a lesion on the left postericular portion of his upper neck which looked like a basal cell carcinoma which *Page 10 
was excised on February 2, 2005. On March 9, 2005, plaintiff presented with lesions behind his right ear and on his forehead and on his left eyebrow, which appeared to be actinic keratosis and which were treated with Efudex. The last time plaintiff was seen prior to the deposition of Dr. Kenyon was on May 9, 2005, when he presented with a small scaly skin lesion on his right cheek, which would be watched.
28. While Dr. Kenyon opined that the occupational exposure to chemicals in the work place contributed to the development of the basal cell carcinoma for which he treated plaintiff, he also agreed that 99.9% of all basal cell carcinomas are attributed to sun damage. Dr. Kenyon further noted that the lesions plaintiff suffers from are located on typically sun exposed skin surfaces.
29. Dr. Kenyon did not have an understanding of the extent to which any of the alleged compounds to which plaintiff may have been exposed were applied on his skin dermally, nor whether any of the exposure was of sufficient concentration to actually result in an increased risk for the development of carcinoma. The only information Dr. Kenyon had with regard to any particular compound coming in contact with the skin is based on what plaintiff told him.
30. Dr. Kenyon agreed that, in order to determine a relationship between a particular compound and the development of a disease, he would have to know scientifically whether that particular compound placed individuals at an increased risk for the development of a disease. He further agreed that in the absence of that information, an opinion regarding the existence of such a relationship would be conjecture. Dr. Kenyon also testified that, until such time as an epidemiological study, and science in general, has reached a correlation that a certain chemical has a caustic effect on the skin, any correlation made would be an assumption that he would have a difficult time making. Dr. Kenyon agreed that, in the absence of any suggestion *Page 11 
epidemiologically that there is a statistically significant increased number of basal cell carcinomas in a particular exposed population, he could not make a scientific attribution of the same to that exposure.
31. Dr. Dennis Darcey is a physician specializing in occupational and environmental medicine at Duke University Medical Center. Dr. Darcey has a Bachelor's Degree in Biology, a Masters Degree in Public Health, as well as an M.D. Dr. Darcey is board certified in preventive medicine with a specialty in occupational medicine and is a fellow in the American College of Occupational and Environmental Medicine.
32. Dr. Darcey testified that basal cell carcinoma is really very common in the population, especially for people such as plaintiff who have fair skin and blue eyes. Dr. Darcey conducted a review of the literature with regard to basal cell carcinoma and the tire manufacturing industry. Dr. Darcey noted that if the studies show a link between the tire manufacturing industry and skin cancer, it was only with squamous cell carcinoma. Dr. Darcey reviewed plaintiff's medical records, the MSD sheets, and the industrial hygiene testing at defendant-employer's plant in Fayetteville, among other things. It was his conclusion that plaintiff's basal cell carcinoma was most likely caused by sun exposure as a child and not due to working in the tire industry. This was based on plaintiff's multiple actinic keratosis which are sun-induced changes, along with the fact that the literature did not evidence an increased risk for the development of basal cell carcinoma for people who work in the tire industry. The strength of association scientifically, medically and epidemiologically between sun exposure and basal cell carcinoma in an individual such as plaintiff, who has fair skin, blue eyes, and red hair, is very strong and the risk was very high. Dr. Darcey opined that plaintiff's work exposures were more than likely unrelated to his basal cell carcinoma. Instead, according to Dr. Darcey, the *Page 12 
proximate cause of plaintiff's basal cell carcinoma is plaintiff's fair skin, sun exposure, and the fact that he has a history of actinic keratoses.
33. Regarding the proximate cause of plaintiff's basal cell carncinoma, given the evidence presented, including the pathology report indicating plaintiff suffered from sun damaged skin and the qualifications Dr. Kenyon made regarding his causation opinion, the opinion of Dr. Darcey that plaintiff's basal cell carcinoma was most likely caused by sun exposure is given greater weight than the opinion of Dr. Kenyon.
34. Dr. Jonathan Amsel is an occupational epidemiologist who has a Bachelor of Arts in Political Science and Economics from Grinnell College, a Master of Science in Administrative Medicine from Columbia University and an ScD in Epidemiology from Johns Hopkins University. Dr. Amsel testified that statistical analysis done in the field of epidemiology helps in understanding the association between an antecedent factor and a disease. Epidemiological literature supports a strong association between UV sun exposure and basal cell carcinoma.
35. Based on his review of the scientific and epidemiological literature as well as toxicological data and the literature associated with the development of skin cancers and particularly basal cell carcinoma as a result of exposure to chemical compounds used in the petroleum and rubber industry, Dr. Amsel concluded that there was no scientific basis known from which a probable causal relationship between basal cell carcinoma and work in the tire industry could be found. Further, Dr. Amsel testified that, in his opinion as an expert in the field of epidemiology, there were no scientific studies that would support the conclusion that there is an increased risk for the development of basal cell carcinoma in the tire building industry.
36. Dr. Barbara Toeppen-Sprigg is the medical director of global services for defendant-employer and has been in that position since 2000. She began employment with *Page 13 
defendant-employer in 1996 and has held different positions as a consultant, a staff physician and an associate medical director. Dr. Toeppen-Sprigg's current job involves oversight of health and wellness policy and programs as well as oversight of the medical facilities and their budgets for all of defendant-employer's plants worldwide. Within her job description is the responsibility to be aware of medical issues and risk assessment. Dr. Toeppen-Sprigg is Board Certified in Family Medicine and Occupational Medicine.
37. It is Dr. Toeppen-Sprigg's opinion to a reasonable degree of medical certainty, that there is no extant literature that would associate the chemical compounds in question with the development of basal cell carcinoma. However, there is voluminous literature implicating ultraviolet radiation to the development thereof. In conclusion, Dr. Toeppen-Sprigg stated that it is not likely that plaintiff's basal cell carcinoma is associated with his employment in the tire manufacturing industry.
38. Dr. Toeppen-Sprigg testified that there was nothing unique regarding exposures at the Kelly Springfield plant in Fayetteville as opposed to other plants in their system. She did note, however that, in fact, "the Fayetteville plant is. . . one where I get very few issues about dermatitis. It is very rare to have a dermatitis question at Kelly Springfield." There have been no outbreaks, clusters or any other signals as a result of a particular condition that would alert defendant-employer that there was a basal cell carcinoma exposure risk at the Fayetteville plant.
39. The Full Commission gives weight to the opinions expressed by Drs. Amsel and Topeppen-Sprigg regarding a causal relationship between basal cell carcinoma and working in the tire industry.
40. Mr. Robert D. Hofer is employed by defendant-employer and is currently a Global Industrial Health Engineer. His primary responsibility is industrial hygiene globally. In *Page 14 
1983, Mr. Hofer obtained his Board Certification in Industrial Hygiene from the American Board of Industrial Hygiene.
41. Mr. Hofer does not have knowledge of any literature that is published in the industrial hygiene field or published in any of the other medical journals that he reviews in his position with defendant-employer that supports the position that there is an increased risk for the development of basal cell carcinoma associated with tire building or working in the tire building department.
42. Mr. Hofer is not aware of, nor has he identified, any substance or compound that would be associated with the development of basal cell carcinomas in the tire building area of the Fayetteville plant. Further, as an industrial hygienist, Mr. Hofer is not aware of any chemicals or compounds to which an employee in the tire building area could be exposed dermally or inhalationally or by any other fashion that would place an employee at an increased risk of development of basal cell carcinoma.
43. Based on Mr. Hofer's industrial hygiene experience and his knowledge of the chemicals used in the tire building area of the Fayetteville plant and to an industrial hygiene probability and scientific likelihood associated with and founded upon industrial hygiene principles, it was Mr. Hofer's opinion that there was nothing that plaintiff would have been exposed to in his work environment that would have caused basal cell carcinoma.
44. The greater weight of the evidence does not show that plaintiff was exposed to mineral oil or paraffin or any compounds, products, or residue of these substances as defined and set forth under N.C. Gen. Stat. § 97-53(14) while working for defendant-employer in such form and quantity and used with such frequency as to cause his basal cell carcinoma. While Urbonine/Sundex is a compound containing paraffinic distillate solvent extract and is an *Page 15 
ingredient in the rubber, there has been no competent, credible evidence showing that by touching the solid rubber compound containing Urbonine/Sundex that paraffin or a paraffin residue can be released from the rubber, deposited on the skin, and result in the development of basal cell carcinoma.
45. Plaintiff has failed to show that his epitheliomatous cancer was caused by exposure to mineral oil, paraffin, or any compound, product, or residue of these substances.
46. The greater weight of the evidence shows that basal cell carcinoma is an ordinary disease of life to which the public is equally exposed. The greater weight of the evidence does not show that basal cell carcinoma is characteristic of persons engaged in the tire manufacturing industry or that working for defendant-employer placed plaintiff at an increased risk of developing basal cell carcinoma.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In workers' compensation cases, plaintiff has the burden of proving every element of compensability. As part of this burden, plaintiff must present convincing evidence establishing these elements, including, in this case, expert medical testimony. Holley v. ACTS, Inc., 357 N.C. 228,234, 581 S.E.2d 750, 754 (2003); Harvey v. Raleigh PoliceDepartment, 96 N.C. App. 28, 35, 384. S.E.2d 549, 553, disc. rev.denied, 325 N.C. 706, 388 S.E.2d 454 (1989).
2. Pursuant to N.C. Gen. Stat. § 97-53(14), epitheliomatous cancer or ulceration of the skin or of the corneal surface of the eye due to tar, pitch, bitumen, mineral oil, or paraffin, or *Page 16 
any compound, product, or residue of these substances is deemed to be an occupational disease. North Carolina General Statute § 97-53 further states,
 Occupational diseases caused by chemicals shall be deemed to be due to exposure of an employee to the chemicals herein mentioned only when as a part of the employment such employee is exposed to such chemicals in such form and quantity, and used with such frequency as to cause the occupational disease mentioned in connection with such chemicals.
N.C. Gen. Stat. § 97-53.
3. In the case of occupational diseases, proof of a causal connection between the disease and the plaintiff's occupation must of necessity be based on circumstantial evidence. Among the circumstances which may be considered are the following: (1) the extent of exposure to the disease or disease-causing agents during employment, (2) the extent of exposure outside employment, and (3) absence of the disease prior to the work-related exposure, as shown by the employee's medical history.Booker v. Duke Medical Ctr., 297 N.C. 458, 256 S.E.2d 189 (1979). Plaintiff alleged he was exposed to mineral oil and paraffin or a compound, product or residue of these substances. However, plaintiff has failed to prove exposure to these substances, or a compound, product, or residue of one of these substances. Plaintiff has also failed to prove that his basal cell carcinoma was caused by any exposure mineral oil, paraffin, or any compound, product, or residue of these substances. Plaintiff did not sustain an occupational disease under N.C. Gen. Stat. § 97-53(14).
4. Assuming arguendo that plaintiff alleged that he suffered from an occupational disease under N.C. Gen. Stat. § 97-53(13), plaintiff must prove that the disease is characteristic of individuals engaged in the particular trade or occupation in which the plaintiff was engaged, that the disease is not an ordinary disease of life to which the public is equally exposed, and that there exists a causal relationship between the disease and plaintiff's employment. N.C. Gen. Stat. § 97-53(13); *Page 17 Rutledge v. Tutlex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).Fann v. Burlington Indust., 59 N.C.App. 512, 296 S.E.2d 819 (1982);Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
5. Plaintiff has not proven by the greater weight of the evidence that his employment with defendant-employer caused him to contract basal cell carcinoma or that his employment with defendant-employer placed him at a greater risk than the general public of contracting basal cell carcinoma. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tutlex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). Fann v. BurlingtonIndust., 59 N.C.App. 512, 296 S.E.2d 819 (1982); Booker v. Duke MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim is hereby DENIED.
2. Each side shall bear its own costs.
This the 24th day of May, 2007.
 S/ _____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/ _____________ BUCK LATTIMORE *Page 18 
CHAIRMAN
 S/ _____________ LAURA KRANIFELD MAVRETIC COMMISSIONER. *Page 1